# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF TEXAS

### HOUSTON DIVISION

| | |
|---|---|
| AMIR HASSAN, Individually and On Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) | **CIVIL ACTION NO.** |
| ) | |
| vs. ) | |
| ) | CLASS ACTION COMPLAINT |
| ) | |
| IMPERIAL SUGAR COMPANY, JOHN C. SHEPTOR and HAROLD P. MECHLER, ) ) | **JURY TRIAL DEMANDED** |
| Defendants. ) | |

Plaintiff, Amir Hassan ("Plaintiff"), alleges the following based upon the investigation of Plaintiff's counsel, which included, among other things, a review of defendants' public documents, conference calls and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Imperial Sugar Company ("Imperial Sugar" or "ISC" or the "Company") and securities analysts' reports and advisories about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal class action on behalf of purchasers of the securities of Imperial Sugar, who purchased or otherwise acquired Imperial Sugar securities between December 29, 2010 and August 5, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Imperial Sugar processes and markets refined sugar in the United States, selling its product to food manufacturers, retail grocers and foodservice distributors. Imperial Sugar markets products nationally under the Imperial, Dixie Crystals and Holly brands.  The Company operates refineries in Georgia and Louisiana, and through its joint venture operations, markets sugar and other sweeteners in Canada and Mexico.

3.     In February 2008, there was an industrial accident at Imperial Sugar's Port Wentworth, Georgia refinery (the "Port Wentworth refinery").  Prior to the accident, production at the Port Wentworth refinery accounted for about 60% of the Company's capacity.  Following the accident, production was suspended until 2009.  In the summer of 2009, Imperial Sugar began limited bulk sugar production at the Port Wentworth refinery, with packaging production beginning there in the fall of 2009.

4.     On August 5, 2011, the Company shocked investors when, seemingly out of nowhere, it reported a quarterly loss of $16.1 million, or $1.35 per share.  The Company stated that higher raw sugar costs along with lower volumes reduced gross margins for the quarter. Throughout that day, the market learned that the Company's industrial sales for the quarter had fallen by more than 40% from the same period the previous year, and that the Port Wentworth refinery had continued to experience operating defects, resulting in higher production costs. Further, investors learned that competition from low cost offerings by Mexican and other refiners had a material adverse effect on Imperial Sugar's gross margins and sales.

5.     Following these revelations, shares of the Company's stock plummeted $13.75 per share, or nearly 60 percent, to close on August 5, 2011 at $9.44 per share, on extremely heavy trading volume.  Imperial Sugar shares continued to decline the next trading day, falling

an additional $1.65 per share, or over 17 percent, to close on August 8, 2011 at $7.79 per share, also on heavy trading volume.

6.     The Complaint alleges that, throughout the Class Period, the defendants failed to disclose material adverse facts about the Company's financial well-being, business operations, and prospects.  Specifically, defendants failed to disclose or indicate the following: (1) that the Port Wentworth refinery was struggling with operating defects, resulting in elevated production costs; (2) that, due to a known but undisclosed lack of demand for the Company's products, driven by the Company's competitors offering lower-priced products, the Company's sales volumes were declining; (3) that as a result of these factors, the Company was experiencing a decline in its gross margins; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the defendants' positive statements about the Company's business operations and prospects lacked any reasonable basis at the time they were made.

7.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members suffered damages.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

10.     Venue is proper in this District pursuant to pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  Additionally, Imperial Sugar's principal executive offices are located within this District.

11.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce.

## PARTIES

12.     Plaintiff, Amir Hassan, as set forth in the accompanying certification, incorporated by reference herein, purchased Imperial Sugar securities at artificially inflated prices during the Class Period and has been damaged thereby.

13.     Defendant Imperial Sugar is a Texas corporation with its principal executive offices located at One Imperial Square, P.O. Box 9, Sugar Land, Texas.

14.     Defendant John C. Sheptor ("Sheptor") was, at all relevant times, the Company's President, Chief Executive Officer ("CEO") and a member of the Company's Board of Directors.

15.     Defendant Harold P. Mechler ("Mechler") was, at all relevant times, the Company's Chief Financial Officer ("CFO"), Principal Financial Officer, Principal Accounting Officer and Senior Vice President.

16.     Defendants Sheptor and Mechler are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Imperial Sugar's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each defendant was provided with copies of the

Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.

## SUBSTANTIVE ALLEGATIONS

### Background

17.     Imperial Sugar processes and markets refined sugar in the United States, selling its product to food manufacturers, retail grocers and foodservice distributors. Imperial Sugar markets products nationally under the Imperial, Dixie Crystals and Holly brands. The Company operates refineries in Georgia and Louisiana, and through its joint venture operations, markets sugar and other sweeteners in Canada and Mexico.

18.     In February 2008, there was an industrial accident at the Port Wentworth refinery. Prior to the accident, production at the Port Wentworth refinery accounted for about 60% of the Company's capacity. Following the accident, production was suspended until 2009. In the summer of 2009, Imperial Sugar began limited bulk sugar production at the Port Wentworth refinery, with packaging production beginning there in the fall of 2009.

### Materially False and Misleading
### Statements Issued During the Class Period

19.     The Class Period begins on December 29, 2010, when the Company issued a press release entitled "Imperial Sugar Company Reports Fourth Quarter and Fiscal Year 2010 Results." The press release stated, in relevant part:

Imperial Sugar Company (NASDAQ:IPSU) today reported a net loss for the fiscal fourth quarter ended September 30, 2010 of $2.3 million, or $0.19 per share, compared to a net loss from continuing operations of $0.2 million, or $0.02 per share, for the same period in fiscal 2009. For the year, the Company reported net income of $136.9 million, or $11.33 per share, compared to a loss from continuing operations of $23.8 million, or $2.03 per share, for fiscal 2009. The current year results include pretax gains resulting from the settlement of insurance claims totaling $278.5 million.

***Results for both fiscal 2010 and 2009 were impacted by the absence of a fully operational Port Wentworth refinery, which normally comprises approximately 60% of the Company's refining capacity.***

***"Imperial Sugar Company took important strategic steps in fiscal 2010 while managing the challenges associated with restoring full production at the Port Wentworth refinery,"*** stated John Sheptor, president and CEO of Imperial Sugar. ***"As production rates at the Port Wentworth refinery increased during the year, we identified facility and process modifications necessary to return the refinery to historical operating levels. We completed the last major modification in October 2010, and output improved significantly. While production days and fixed costs had a negative impact on fiscal 2010 results, the improvements that we have made should lead to sustained results at higher rates in 2011."***

***Sheptor continued, "Other important steps were taken in 2010 to strengthen our business and provide a path to a stronger future. Construction of the new refinery in Louisiana by our recently formed joint venture is well under way, with completion targeted for the summer of 2011.*** Our Natural Sweet Ventures initiative provides an exciting opportunity to expand our portfolio of all natural sweeteners. Customer interest in our stevia/sucrose products under the Steviacane(TM) brand name has been encouraging. The continued success of our strategic Mexican alliance was invaluable in dealing with the increasing complexities arising in the NAFTA sugar region, while Wholesome Sweeteners experienced significant top line and earnings growth from their organic and fair trade portfolio of sweeteners." [Emphasis added.]

20.     Also on December 29, 2010, the Company filed its 2010 Annual Report with the SEC on Form 10-K. The Company's Form 10-K was signed by the Individual Defendants, and reaffirmed the Company's financial and operational results announced that same day. Additionally, the Form 10-K stated, in relevant part:

**ITEM 9A. Controls and Procedures**

**Management's Evaluation of Disclosure Controls and Procedures**

In accordance with Exchange Act Rules 13a-15 and 15d-15, we carried out an evaluation, under the supervision and with the participation of management, including our President and Chief Executive Officer and our Senior Vice

President and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. Based on that evaluation, our President and Chief Executive Officer and our Senior Vice President and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of September 30, 2010 to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Executive Financial Officer, as appropriate, to allow timely decisions regarding required disclosures.

21. The Company's Form 10-K also contained Sarbanes-Oxley required

certifications, signed by the Individual Defendants, which stated:

I, [John C. Sheptor/H. P. Mechler], certify that:

1. I have reviewed this annual report on Form 10-K of Imperial Sugar Company;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

      c)     evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

      d)     disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

      a)     all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

      b)     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*     *     *

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Subsections (a) and (b) of Section 1350, Chapter 63 of Title 18, United States Code), John C. Sheptor, President and Chief Executive Officer, and H.P. Mechler, Senior Vice President and Chief Financial Officer, of Imperial Sugar Company, a Texas corporation (the "Company"), each hereby certifies that, to the best of his knowledge:

(1)     the Company's Annual Report on Form 10-K for the year ended September 30, 2010 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

22.     On February 7, 2011, the Company issued a press release entitled "Imperial Sugar Company Reports First Quarter Fiscal 2011 Results." Therein, the Company stated, in relevant part:

*Imperial Sugar Company (NASDAQ:IPSU) today reported a net loss for the fiscal first quarter ended December 31, 2010 of $8.9 million, or $0.75 per diluted share.* Results for the same period of fiscal 2009, which included $278.5 million of pre-tax gains associated with settlement of insurance claims related to

8

the February 2008 Port Wentworth accident, was net income of $178.1 million, or $14.84 per share. Additionally, the prior year's results included $18.9 million of mark-to-market gains on raw sugar derivatives intended to hedge raw sugar purchases in subsequent periods. Absent the insurance and derivative gains the prior year's results would have been a net loss of $12.2 million, or $1.03 per share.

Net sales for the quarter ended December 31, 2010 increased to $227.4 million compared to $173.8 million for the same period in the prior year. The increased revenues were due to 11% higher sales volumes and 18% higher refined prices. Gross margin as a percent of sales was a negative 1.6% in the current quarter compared to 7.1% last year, including 10.9% attributable to the mark-to-market derivative gain. Current quarter results include a $2.9 million severance charge related primarily to the transition of refining operations in Louisiana.

*"A number of important milestones were reached during the past few months as we continue to implement our strategic vision and position the company for the future," stated John Sheptor, president and CEO. "We completed the necessary improvements to the Gramercy refinery, and turned over operational control of the facility to Louisiana Sugar Refining, LLC, our one-third owned joint venture, on the first of January. LSR re-initiated refining operations in the existing refinery in early February. Construction of the new LSR refinery remains on track for a summer 2011 start-up."*

Sheptor continued, "We are encouraged by the early results of the retail consumer trial initiated in November of SteviacaneTM, the first stevia-sucrose product developed by our 50% owned Natural Sweet Ventures. Consumer feedback has been positive and we are planning a wider retail distribution beginning later this year."

Domestic raw sugar prices increased rapidly during the past 18 months, in part in response to significantly higher world raw sugar prices. Domestic raw sugar costs were 12.6% higher for the first fiscal quarter compared to the same period last year. Selling, general and administrative costs were 27% lower in the current quarter due to lower compensation and legal costs.

*"The process modifications implemented in the Port Wentworth refinery at the beginning of October produced immediate improvements in refinery results," added Sheptor. "The refined silo repairs were completed by the contractor in mid-January and we anticipate placing the silos back in service in early February. We are anxious to continue the ramp-up in production in Port Wentworth once the silos are on line."* [Emphasis added.]

23.     Also on February 7, 2011, Imperial Sugar filed its Quarterly Report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by Defendant Mechler, and reaffirmed the Company's financial and operational results announced that same day. The Company's

Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 21, *supra*.

24.      On May 10, 2011, the Company issued a press release entitled "Imperial Sugar Company Announces Second Fiscal Quarter 2011 Results and Declares Quarterly Dividend." Therein, the Company stated, in relevant part:

> Imperial Sugar Company (NASDAQ:IPSU) today reported a net income of $4.2 million, or $0.34 per diluted share, for the second fiscal quarter ended March 31, 2011, compared to a net loss of $33.3 million, or $2.82 per diluted share, for the second fiscal quarter of 2010. The current quarter results include a $3.6 million pretax gain related to the contribution of the Gramercy, Louisiana refinery to Louisiana Sugar Refining, LLC, a previously formed joint venture in which the Company has a one-third interest.
>
> *"We are pleased with the progress made in a number of areas during the second quarter," commented John Sheptor, president and CEO of Imperial Sugar. "We achieved sales price increases during the second quarter and successfully managed raw costs in a volatile price environment, so as to expand margins significantly."*
>
> *Sheptor continued, "After a challenging re-start early in the quarter, LSR's operation of the existing Gramercy refinery is providing a steady flow of bulk sugar for our grocery packaging operation. The reconnection of the silos in Port Wentworth, which was deferred until the first week of April, went smoothly, and the refinery has begun to ramp up production rates again."*
>
> Net sales for the second fiscal quarter were $192.2 million, compared to $208.9 million for the same period last year. The reduction in quarterly sales was principally due to the loss of direct sales volumes from the Gramercy refinery, which commencing January 1, 2011, was operated by LSR. Offsetting these lower volumes, domestic sugar prices in the current quarter increased 20% compared to second fiscal quarter 2010.
>
> Raw sugar costs during the second quarter benefited from the liquidation of LIFO basis inventory at a cost which was $14.3 million lower than current raw sugar costs. Offsetting this benefit was the impact on raw sugar costs of derivative gains totaling $19.1 million recognized in prior years which were intended to hedge current period purchases. Lower manufacturing costs and improved yields at the Port Wentworth refinery contributed to the improved operating results.
>
> For the three months ended March 31, 2011, gross margin as a percent of sales increased to a positive 5.4% compared to a negative 19.6% in the prior year quarter. The prior year's gross margin percentage was negatively impacted by the timing of the recognition of raw sugar derivative activity; absent the impact of this derivative activity, gross margin as a percent of sales for the quarter ended March 31, 2010 would have been 0.4%. [Emphasis added.]

25.     Also on May 10, 2011, Imperial Sugar filed its Quarterly Report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by Defendant Mechler, and reaffirmed the Company's financial and operational results announced that same day.  The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶ 21, *supra*.

26.     The statements contained in ¶¶ 19-25 were materially false and misleading when made because defendants failed to disclose or indicate the following:  (1) that the Port Wentworth refinery was struggling with operating defects, resulting in elevated production costs; (2) that, due to a known but undisclosed lack of demand for the Company's products, driven by the Company's competitors offering lower-priced products, the Company's sales volumes were declining; (3) that as a result of these factors, the Company was experiencing a decline in its gross margins; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the defendants' positive statements about the Company's business operations and prospects lacked any reasonable basis at the time they were made.

### The Truth Begins to Emerge

27.     On August 5, 2011, the Company shocked investors when it issued a press release entitled "Imperial Sugar Company Announces Third Fiscal Quarter 2011 Results."  Therein, the Company, in relevant part, revealed:

> ***Imperial Sugar Company (NASDAQ:IPSU) today reported a net loss of $16.1 million, or $1.35 per diluted share, for the third fiscal quarter ended June 30, 2011,*** compared to a net loss of $5.7 million, or $0.48 per diluted share, for the third fiscal quarter of 2010. ***Higher raw sugar cost which along with lower volumes reduced gross margin was the primary reason for the loss in the current quarter.***
>
> ***"Our inability to increase prices in the face of higher raw sugar costs because of competitive pressures from domestic and Mexican sources was the principal driver of the quarter's disappointing results," commented John Sheptor, president and CEO of Imperial Sugar.*** "Raw sugar purchased during the quarter

was priced largely against the March and May futures contracts, which peaked near $40 per hundredweight prior to the USDA import quota announcement in early April. The subsequent decline .in the raw sugar futures market which occurred after the quota announcement was only temporary and the raw market has rallied back to near the same level. *Our raw sugar costs in the fourth fiscal quarter should see little relief, while sales prices thus far in the fourth quarter have only improved modestly."*

*Gross margin as a percent of sales was a negative 6.1% for the third fiscal quarter, compared to 0.7% for the third quarter of fiscal 2010.* The prior year's third quarter margins benefited from the recognition of raw sugar derivative gains intended to hedge subsequent periods; gross margin without such gain was a negative 3.4% of sales for the prior year's third quarter.

Raw sugar purchased during the third quarter averaged $38.08 per cwt (on a raw market basis), a 34% increase from the same period of the prior year and 12% higher than the immediately preceding quarter. Domestic sales prices for the third quarter averaged $47.77 per cwt, a 21% increase from the prior year's third quarter and 2.9% higher on a consecutive quarter basis.

*Net sales for the third fiscal quarter were $197 million, compared to $261 million for the same period last year. The reduction in quarterly sales was principally due to the loss of direct sales volumes from the Gramercy refinery,* which has been operated since January 2011 by Louisiana Sugar Refining LLC ("LSR"), a one-third owned joint venture, offset in part by higher sales prices.

*Manufacturing costs for the quarter did not improve from the same period in the prior year. The Port Wentworth refinery's progress toward full production rates was hampered by raw sugar quality and mechanical reliability, including significant interruptions in the steam boilers providing power to the plant. The refinery operated at an average daily melt rate of 4.5 million pounds, approximately 75% of average rates prior to the 2008 industrial accident.*

*Commented Sheptor, "The Company is reviewing potential operating and capital improvements, particularly in the utilities, raw sugar melt and water management areas of the refinery, to begin addressing mechanical reliability in these operations. These areas, which were not part of the reconstruction efforts following the accident, have proved to be impediments to sustaining efficient operations at the production rates achieved prior to the accident."* [Emphasis added.]

28.    The Company's Form 10-Q filed that same day also revealed that Imperial Sugar's industrial sales volumes had fallen by over 40% in the third quarter of 2011 versus the third quarter of 2010.

29.    Also on August 5, 2011, the defendants held a conference call with analysts and investors. During the call, the defendants solicited and responded to questions as follows:

[Analyst]: When it comes to the industrial business, you don't talk about spreads by market segment, but you said it certainly performed better than the foodservice distributor channel. Pricing -- these contracts start coming, new contracts begin at the beginning of the calendar year, is that correct?

[Mechler]: *The majority of our contracts are calendar year contracts, correct.*

[Analyst]: When do the negotiations for that take place?

[Sheptor]: *Negotiations begin generally in the spring of the preceding calendar year, continue through the summer, and into the fall. I think it is fair to say that September period, typically we have about half of our annual contract booked.*

[Mechler]: In a usual year and then by the beginning of the year, beginning of the calendar year, it is starts with an eight most likely, but that can vary, Mitch. It is a matter of when essentially buyer and seller come to a common view of the market. I mean, that is not a fixed timeline, but certainly discussions in the spring sometimes some early booking in the spring or early summer, continuing through the summer and well into the fall.

*Most of the industrial customers want to have established a substantial portion of their ingredient components in their products, sugar being one of them, before they start their fiscal years.* They will leave some unpriced typically, but they want to know their ingredient prices through their budging and before they start their fiscal year.

[Analyst]: And so that, so it makes it awfully difficult for you to hedge those against your ultimate contract needs. If you're pricing here in September 50% or sort of locked in or you have sort of agreed to in September, you know, it is pretty hard to hedge for the whole contract, so there is always a tail exposure, is that correct?

[Mechler]: There is either a tail exposure or what the traders would call a spread risk in that you can't necessarily get the volume of hedge that you want in the periods that you want given the illiquidity in the futures market as you go terribly far out. We have historically used, and including this year, used both pure futures contracts to hedge and some of the mechanisms within our purchase contracts with suppliers to hedge.

We have some abilities to lock in prices in the physical contracts for forward periods over and above what we can do in the futures market. So it's a combination of that, it is part art, it's not perfect science because the Number 16 futures market has liquidity challenges, particularly getting past a couple of contracts forward.

*       *       *

[Sheptor]: *Port Wentworth performance has not improved since reintegrating the silos in April. Reliability of equipment in the older sections of the refinery that were not replaced following the 2008 industrial accident has continued to challenge the operations team. Significant repairs were required to boilers, kilns and cooling towers during the quarter resulting in more frequent and longer outages leading to lower production levels.*

Although plant performance did not materially limit sales volume or service levels in this quarter, ***production cost was negatively impacted by increased refining days and higher maintenance.*** Potential improvements are being reviewed to begin addressing mechanical reliability in these operations.

*       *       *

[Mechler]: [H]alf of US production is from the beet sugar industry who doesn't buy raw sugar. Mexico, which now constitutes 11% in round numbers, this year projected 11% of the domestic US supply, doesn't buy raw sugar.

[Analyst]: Right.

[Mechler]: They don't buy raw sugar in the same manner. They have a different program in Mexico that's completely disconnected from the US raw sugar market. So a substantial portion of the US competition is not even influenced on the cost side by the raw sugar market. So that does moderate, if you will, the influence of the raw sugar market, on the refined sugar market.

[Analyst]: Right. ***So what drove retail prices down? Was it the beet producers or either somebody -- so who had the substantial cost advantage last quarter? Why didn't retail respond to high raw sugar prices?*** Beet producers didn't feel the pain or Mexican producers increased market share. ***Who drove the margin decline? Who drove retail prices to be stagnant to down?***

[Mechler]: ***I don't want to be specific about who drove retail prices*** other than to say that we had and we have for some time been reporting additional Mexican influence in the grocery markets in the southwest, which is an important market for us, the Texas market, to put it in shortcut, and other producers, beet and cane, some of which are integrated cane producers, operate and compete in the retail markets and the other important areas for us, both Texas and the southeast.

So to say -- ***I am not going to single out which competitor or competitors, but suffice it to say a combination of Mexican and domestic producers some of which are integrated beet producers,*** some of which are integrated cane producers, and some do buy raw sugar in the futures market like we do. [Emphasis added.]

30.      On these revelations, shares of the Company's stock fell $13.75 per share, or

59.29 percent, to close on August 5, 2011 at $9.44 per share, on extremely heavy trading volume.

Imperial Sugar shares continued to decline the next trading day, falling an additional $1.65 per

share, or 17.46 percent, to close on August 8, 2011 at $7.79 per share, also on heavy trading

volume.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

31.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Imperial Sugar securities during the Class Period (the "Class"). Excluded from the Class are defendants, directors and officers of Imperial Sugar and their families and affiliates.

32.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. According to the Company's Form 10-Q filed with the SEC on August 5, 2011, Imperial Sugar had over 12 million shares of stock outstanding, owned by thousands of persons.

33.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    (a)    Whether the Securities Exchange Act was violated by defendants;

    (b)    Whether defendants omitted and/or misrepresented material facts;

    (c)    Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    (d)    Whether defendants knew or recklessly disregarded that their statements were false and misleading;

    (e)    Whether the prices of Imperial Sugar securities were artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

34.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

35.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

36.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## LOSS CAUSATION/ECONOMIC LOSS

37.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.  The price of Imperial Sugar's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.  As a result of their purchases of Imperial Sugar securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## SCIENTER ALLEGATIONS

38.     During the Class Period, the defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time.  In so doing, the defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of Imperial Sugar's securities during the Class Period.

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**

39.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's securities traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     Plaintiff and other members of the Class purchased Imperial Sugar securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

40.     At all relevant times, the market for Imperial Sugar securities was efficient for the following reasons, among others: (a) as a regulated issuer, Imperial Sugar filed periodic public reports with the SEC; and (b) Imperial Sugar regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## NO SAFE HARBOR

41.     Defendants' verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

42.     The defendants are also liable for any false or misleading FLS pléaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Imperial Sugar who knew that the FLS was false.   None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

43.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

44.     During the Class Period, Imperial Sugar and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Imperial Sugar securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, these defendants, and each of them, took the actions set forth herein.

45.     Imperial Sugar and the Individual Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Imperial Sugar securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  These defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons.

## SECOND CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

46.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

47.     The Individual Defendants acted as controlling persons of Imperial Sugar within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after

these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

48.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

49.     As set forth above, Imperial Sugar and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages and equitable relief in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 22, 2011

Respectfully submitted,

By: _____
RICHARD E. NORMAN
Texas State Bar No. 00788128
**CROWLEY NORMAN LLP**
3 Riverway, Ste, 1775
Houston, Texas  77056
713-651-1771
713-651-1775 (facsimile)
rnorman@crowleynorman.com

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
D. Seamus Kaskela*
skaskela@ktmc.com
David M. Promisloff*
dpromisloff@ktmc.com
Adrienne O. Bell*
abell@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (fax)
*Pro Hac Vice Application to be filed*

*Attorneys for Plaintiff*